Maynard BOSTROM

v.

SEGUROS TEPEYAC, S.A., Compania
Mexicana de Seguros Generales.

Civ. A. No. 4596.

United States District Court
N. D. Texas,
Fort Worth Division.

Oct. 16, 1963.

A. H. Manus, Jr., Freeport, Ill., for plaintiff.

Wm. Brown, Fort Worth, Tex., for defendant.

BREWSTER, District Judge.

G. A. Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App.1929, 15 S.W.2d 544, opinion approved by Texas Supreme Court, on subsequent appeal, American Indemnity Co. v. G. A. Stowers Furniture Co., Tex.Civ.App. 1931, 39 S.W.2d 956, writ refused, held that an automobile indemnity insurer was liable in a tort action for the amount of a judgment against its insured above the limits of its public liability policy, where it had negligently rejected a proposition to settle the claim involved for a sum within such limits after it had undertaken the defense of the claim. It is a landmark case in this State, and the rule announced in it has come to be generally known as the "Stowers doctrine", although that designation now includes the entire theory of this type of action as made by the Stowers case and the later Texas cases on the question. This present diversity action by Bostrom against Seguros Tepeyac, S.A., Compania Mexicana de Seguros Generales raises the Texas-size questions of whether the facts in this case present negligence for misfeasance or nonfeasance, and, if the latter, whether the Stowers doctrine

has been or should be enlarged so as to include that character of negligence. A holding favorable to the plaintiff on the issues involved would give him the right to collect from the defendant a $270,000.-00 judgment he has obtained against the insured and his driver, when the automobile public liability policy issued by the defendant provided a limit of $5,000.00 for injuries to any one person.

The following quotation of the theory relied upon by the plaintiff is taken from the pre-trial order approved by the respective attorneys for the parties hereto:

"Plaintiff claims that the defendant, in spite of the fact that it had notice of the collision, causing plaintiff's injuries, and notice of the fact that plaintiff had filed suit against the said insured and his authorized driver, and in spite of the fact that it had notice that its insured had called upon this defendant to defend the suit, nevertheless failed to perform its duty to investigate the collision, failed to perform its duty to defend the suit, failed in its duty to attempt to negotiate a settlement, and that all of said acts were done negligently, whereupon judgment was rendered against the insured and the driver in the amount of TWO HUNDRED AND SEVENTY THOUSAND DOLLARS ($270,-000.00), together with costs of suit, for which defendant is liable under the authority of the doctrine familiarly known as Stowers Doctrine; that defendant had a duty to do all of the things enumerated under the pertinent laws."

"This plaintiff is a third party beneficiary of defendant's insurance policy and is entitled to bring suit based on negligence in his own name against this defendant."

The defendant's position is, *first,* that the plaintiff could not maintain suit against the defendant on the policy to which he was not an actual party; *second,* that under the terms of the policy it owed no duty to investigate, settle or defend the plaintiff's claim; *third,* that in any event, it could not be liable in tort because it never entered upon the performance of any duties under the policy in connection with the plaintiff's claim; and *fourth,* Jernigan's failure to notify it of the proposition for settlement was contributory negligence and a proximate cause of the $270,000.00 judgment.

On February 12, 1962, the plaintiff recovered a judgment for $270,000.00 in a trial in the Dallas Division of this District, before Judge Hughes without a jury, against James L. Jernigan and Alan J. Sullivan, representing damages for personal injuries sustained by him while riding as a passenger in Jernigan's automobile at a time when it was being driven by Sullivan, and when it was covered by a $5,000.00 and $10,000.00 public liability policy issued to Jernigan by the defendant insurance company.

While the plaintiff recovered his judgment in Texas, the collision causing his injuries occurred in Mexico. The entire transaction involving the purchase and issuance of the insurance policy took place in Nuevo Laredo. The coverage extended only to accidents happening in Mexico within the time limit provided; but there was no territorial limit on the place of performance of the defendant's obligations under the policy. The defendant company was chartered by and had its principal place of business in Mexico; but it had a permit to do business in Texas, and had made a deposit of $25,000.00 with the Treasurer of that State under the provisions of the Insurance Code of Texas to secure the payment of claims against it.

In the latter part of November, 1958, the three young men, Jernigan, Sullivan and Bostrom, travelled together in Jernigan's car on a joint pleasure trip to Mexico. They drove directly from Dallas County, where they then resided, to Nuevo Laredo, Mexico, directly across the border from Laredo, Texas. During their short stop in Nuevo Laredo, they proceeded to make the necessary arrangements for their trip into the interior of Mexico. As a part of those ar-

rangements, Jernigan purchased from the defendant company the following three day "Special Automobile Policy for Tourists":

SPECIAL AUTOMOBILE POLICY FOR TOURISTS

# SEGUROS TEPEYAC,

## S. A.

### COMPAÑIA MEXICANA DE SEGUROS GENERALES

TELS. {10-13-61 / 10-06-54}

TELS. {35-47-47 / 10-07-16}

AUTHORIZED CAPITAL $ 5,000,000.00

BALDERAS No. 31 FOURTH FLOOR
P. O. BOX 20993
CABLE ADDRESS "TEPEYASA"

CAPITAL PAID UP $ 3,500,000.00

**MEXICO I, D. F.**

NOTICE: IN CASE OF CANCELLATION MINIMUM RETENTION ON PREMIUM BY THE COMPANY IS $ 7.50 U. S. CY.

NOTICE: PILFERAGE EXCLUDED, THEFT IS FOR THEFT OF ENTIRE CAR.

**POLICY**

No. T.R-23265 T

TERM OF INSURANCE 3 days
FROM 1 Noviembre, 27 19 58 TO Noviembre 30 19 58

(AT _____ HOURS) OF THE PLACE OF ISSUE

(AT _____ HOURS) OF THE PLACE OF ISSUE

| | |
|---|---|
| SUM INSURED DLLS. | 17,500.00 U. S. CY |
| PREMIUM | $ 5.34 |
| POLICY FEE | $ .50 |
| TAX | $ .15 |
| TOTAL | $ 15.99 |

SEGUROS TEPEYAC, S. A. CIA. MEXICANA DE SEGUROS GENERALES (hereinafter called "THE COMPANY",) does insure within the limits of the Mexican Republic, in favour of James L. Jernigan (hereinafter called "THE INSURED") domiciled at Dallas, Texas, in accordance with the conditions of this policy and during the established term of the coverage, against those risks appearing in the following Specification of Risks and which show an insured sum assigned there to or otherwise the annotation "COVERED", suffered or caused by the hereinafter described vehicle:

| YEAR AND MODEL | MAKE | TYPE OF BODY AND CAPACITY | MOTOR No. | SERIAL No. |
|---|---|---|---|---|
| 1958 | Ford | 4 doors | GBDT 105833 | |

The maximum amount covered by this Policy appears in the Specification of Risks hereof, and therefore the payments which the Company may effect, whether due to one or more losses arising out of any of the various risks covered hereunder, as herein specified, shall in no case exceed the amount stipulated in each Section of said Specification of Risks.

| SPECIFICATION OF RISKS | COVERED / EXCLUDED | LIMIT OF LIABILITY |
|---|---|---|
| 1.- Collision and upset with $50.00 U. S. Cy. deductible; TRANSPORTATION | Si | |
| 2.- Fire and lightning; total theft of the vehicle; strikes and riots; cyclone, hurricane, hail, earthquake, volcanic eruption, flood, explosion and landslide, and breakage of glass. | Si | |
| Under Sections 1 and 2, jointly or separately, the Company's liability shall be limited to the ACTUAL CASH VALUE of the described vehicle at time of loss, not exceeding the sum of _____ | $ 2,500.00 | U. S. Cy. |
| 3.- Property Damage Liability: _____ | $ 5,000.00 | U. S. Cy. |
| 4.- Bodily Injury Liability: Limit for two or more persons in one or various accidents _____ | $ 10,000.00 | U. S. Cy. |
| not exceeding the sum of $ 5,000.00 U. S. Cy. in respect to any one person. | | |
| 5.- Medical Expenses: Limit for all occupants _____ | $ | U. S. Cy. |
| not exceeding the sum of $ _____ U. S. Cy. in respect to each occupant. | | |
| THE MAXIMUM SUM COVERED BY THIS POLICY, DIVIDED AS AFORE MENTIONED, AMOUNTS TO: | $ 17,500.00 | U. S. Cy. |

The Company agrees that within the terms, exceptions and General Conditions hereof, the indemnities payable to the Insured shall be effected once the damage suffered or caused by the vehicle has been proved and adjusted.

IN WITNESS WHEREOF, the Company signs these presents in the City of _____ (but if this Policy is issued by an Agent of the Company, duly authorized for the purpose, same shall not be valid unless countersigned by said Agent).

Countersigned in Laredo, Tamps. this 27th. day of November 19 58

SEGUROS TEPEYAC, S. A.
CIA. MEXICANA DE SEGUROS GENERALES

Signature _____
(A G E N T)

Aprobado por la Comisión Nacional de Seguros en Oficio No. 1266 de Fecha 15 de Febrero de 1956

On November 28, 1958, the day following the arrival of the plaintiff and his friends in Mexico, the Jernigan car collided with a common carrier Mexican bus on a public highway in that Republic some distance south of Nuevo Laredo. Sullivan was driving with Jernigan's permission, and the plaintiff was asleep in

the back seat of the Jernigan car at the time of the collision. The plaintiff sustained about as serious injuries as a person could endure and live, and they have resulted in his being a permanent quadriplegic.

The defendant received notice of the collision on the date that it occurred. It promptly made an investigation of the accident; and, within eight days thereafter, it settled with Jernigan and the Mexican bus company respectively for damages to his automobile and to its bus. The defendant does not claim that it was without knowledge of the fact that Bostrom was seriously injured in the collision. The least diligence in the investigation would have disclosed that fact from the beginning.

Due to the critical nature of his injuries, Bostrom did not communicate with the defendant company for several months. Letters were written to the defendant for him on September 20, October 10, and December 1, 1959, in connection with his claim. Although requests were made in the letters for a copy of the policy, they were ignored. It was not until July 11, 1960 that the defendant mailed a copy of the policy to the plaintiff or his attorneys. That copy is the same as the policy sued upon in this case. Jernigan testified that it was a copy of all that was delivered to him when he bought the policy. There is no evidence to substantiate the defendant's contention made in some of its letters and on the trial of this case that the policy it delivered to Jernigan included an additional sheet containing specifications of risks excluding liability for injuries to third parties riding as passengers in the insured automobile.

On or about June 24, 1960, which was shortly prior to the filing of his suit, the plaintiff made an offer to Jernigan and Sullivan to settle his claim against them for $5,000.00. The offer was not communicated to the defendant, and it had no knowledge of the existence thereof until after the plaintiff obtained his judgment for $270,000.00. Jernigan and Sullivan could not accept it because they had no means. The plaintiff's suit against Jernigan and Sullivan was filed on July 12, 1960, but the offer of settlement was never withdrawn prior to the time of the judgment in February, 1962. The defendant's letter of July 11, 1960, transmitting a copy of the policy to plaintiff's attorneys, stated that it had made all the payments it was obligated to make and denied all responsibility in connection with the Bostrom claim. By letter dated August 2, 1960, Jernigan advised the defendant of the filing of Bostrom's action in the federal court for damages against Sullivan and him, and called upon it to defend the suit. There was considerable correspondence between the defendant and the attorney for Jernigan and Sullivan during the period between the filing of the case and the trial of it. The defendant consistently denied liability and refused to defend the case.

The defendant never conducted any investigation under the Jernigan policy other than the one made during the eight day period immediately following the accident. It did not participate in any way in the defense of the litigation by Bostrom against Jernigan and Sullivan. There was never any effort on the part of the defendant at any time to negotiate or to effect a settlement of the Bostrom claim.

Execution on the $270,000.00 judgment was returned *nulla bona,* and nothing has been paid on it. Bostrom has brought this suit seeking to collect the full amount of the judgment from the defendant insurance company. A jury trial has resulted in findings favorable to the plaintiff on the following interrogatories in a special verdict:

"Do you find from a preponderance of the evidence that the defendant insurance company was guilty of negligence in not initiating and attempting to bring about a settlement of the claim of the plaintiff Bostrom against the insured Jernigan, within the $5,000 limit of the public liability policy in question?

"ANSWER: It was negligent.

"Do you find from a preponderance of the evidence that such negligence on the part of the defendant insurance company, if any you have found in answer to Question No. 1, was a proximate cause of the judgment for $270,000 in favor of Bostrom and against Jernigan and Sullivan, jointly and severally, which has been admitted in evidence in this case?

"ANSWER: It was.

"Do you find from a preponderance of the evidence that the insured, Jernigan, was guilty of contributory negligence in failing to communicate to the defendant insurance company the $5,000.00 offer of settlement on the Bostrom claim against him and Sullivan?

"ANSWER: He was not."

The case is now before the Court on the plaintiff's motion for judgment and the defendant's motion for judgment non obstante veredicto.

■ There is no claim here that the applicable substantive laws of this State, including those relating to questions of conflict of laws as between Texas and Mexico, impair any right conferred by the Constitution or laws of the United States. The Court will therefore determine the substantive rights of the parties by the laws of Texas, including its conflict of laws rules. Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Klaxon Co. v. Stentor Electric Manufacturing Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Griffin v. McCoach, 1941, 313 U.S. 498, 61 S.Ct. 1023, 85 L.Ed. 1481, 134 A.L.R. 1462.

The decision of the fundamental question in this case has been complicated by the fact that it has been necessary to determine whether, under the Texas conflict of laws rules, the law of Mexico governs some or all phases of the substantive issues, and if so, what that applicable law is. Though the questions involved are intricate and are of importance not only to the plaintiff but to jurisprudence as well, the Court has received little help from the superficial briefs filed by plaintiff's counsel. The result has been a time consuming, thorough research of the authorities by the Court itself.

While the source of this action can be traced to the insurance contract, the violation of the duty alleged was a tort. It will appear from a later discussion of the authorities that the duty was one imposed by law because of the relationship implied by law from the contract rather than one assumed from the terms of the contract itself. It will be necessary, then, to decide to what extent the laws of Texas or of Mexico are applicable to the determination, first, of the legal relationship of the parties under the contract, and second, of what duties were implied and imposed by law from that relationship. The decision of those questions will be controlled by the following Texas rules of conflict of laws:

■ 1. Generally, under the doctrine of comity, the laws of a foreign country will be given effect and the rights accruing thereunder will be enforced in Texas, unless they are contrary to its public policy. Slater v. Mexican National R. Co., 1904, 194 U.S. 120, 24 S.Ct. 581, 48 L.Ed. 900. "The doctrine of comity is permitted and accepted in all civilized states from mutual interest and convenience and a sense of the inconvenience which would otherwise result, and from moral necessity, to do justice in order that justice may be done in return." Strawn Mercantile Co. v. First National Bank of Strawn, Tex.Civ.App.1926, 279 S.W. 473, 474, no writ history.

■ 2. "As a general rule, a contract of insurance is governed, as to its nature, validity, and construction, by the law of the place where it was made, unless the parties appear to have intended the law of a different place to govern." 44 C.J.S. Insurance § 52, p. 504. American National Ins. Co. v. Smith, Tex.Civ.App.1929, 13 S.W.2d 720, writ refused; National Life & Accident Ins. Co. v. Smith, Tex.Civ.App.1929, 20 S.W.

2d 142, writ refused; Boseman v. Connecticut General Life Ins. Co., 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036, 110 A.L.R. 732; Metropolitan Life Ins. Co. v. Wann, 1937, 130 Tex. 400, 109 S.W.2d 470, 115 A.L.R. 1301, opinion adopted by Texas Supreme Court; Washington Nat. Ins. Co. v. Shaw, et al., Tex.Civ.App.1944, 180 S.W.2d 1003, writ dismissed. The last three cases cited held that Art. 5054, Texas Civil Statutes, 1925, which is now Art. 21.42 of the Insurance Code of Texas, V.A.T.S., was inapplicable where the insurance contract was made in another state, and it was not entered into with reference to the laws of Texas or because of any Texas license issued to the insurance company.

■ 3. "The rules which fix the locus delicti, the place of the wrong, as the jurisdiction whose law determines the actionable character of the tort, makes necessary the determination of the place where the wrong was committed. No particular difficulty is encountered in such determination until the act or omission complained of and the injury done occur in different places. In such case it is usually announced as the general rule that the place of wrong, the locus delicti, is the place where the injury sustained was suffered rather than the place where the act was committed, or, as it is sometimes more generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place. The latter is the rule adopted by the American Law Institute in its Restatement." 15 C.J.S. Conflict Of Laws § 12a(2), p. 899. El Paso & N. W. Ry. Co. v. McComas, Tex. Civ.App.1903, 72 S.W. 629, on subsequent appeal, 1904, 36 Tex.Civ.App. 170, 81 S.W. 760, writ refused, cited in Richards v. United States, 1962, 369 U.S. 1, 15, 82 S.Ct. 585, 594, 7 L.Ed. 492, 502, as "holding that the law of the place of injury controls." The following is quoted as the general rule in the last opinion of the McComas case: "All cases agree that, whatever the law of the forum may be, the plaintiff's case must stand, if at all, so far as his right of action is con-

cerned, upon the law of the place where the injury occurred.' " 81 S.W. 760, 761.

■ 4. The general rule in this State is that in the absence of proper proof "the law of another country is presumed to be the same as that of Texas." Tortuguero Logging Operation, Limited v. Houston, Tex.Civ.App. 1961, 349 S.W.2d 315, err. ref., n. r. e.; 1 McCormick and Ray, Texas Law of Evidence, #99; Rowan v. C. I. R., 5 Cir., 1941, 120 F.2d 515. There is an exception to this rule when the system of jurisprudence of the foreign country is fundamentally different from that of Texas. However, it has been recognized by the Court of Appeals for the Fifth Circuit since Mexican Central Ry. Co. v. Marshall, 5 Cir., 1899, 91 F. 933, 938, and Mexican Central Ry. Co. v. Glover, 5 Cir., 1901, 107 F. 356, 361, that the civil law originally prevailed in both Texas and Mexico. It will therefore be presumed in this case that the laws of Mexico and of Texas are the same where there is no credible evidence to the contrary.

■ "Proper proof", as that term is used in the preceding paragraph means credible evidence acceptable to the trier of facts, as the question of the foreign law "is a matter of fact" and the person relying upon such law "is under the burden of going forward with proof of it *at the risk of nonpersuasion.*" Tidewater Oil Co. v. Waller, 10 Cir., 1962, 302 F.2d 638, 640. (Emphasis ours). Even in a jury case, the trial judge is the trier of fact as to the existence of foreign law, and has the responsibility of construing it, if he finds it to exist. Boseman v. Connecticut General Life Ins. Co., 1937, 301 U.S. 196, 57 S.Ct. 686, 81 L.Ed. 1036, 110 A.L.R. 732; Liechti v. Roche, 5 Cir., 1952, 198 F.2d 174. Expert opinion testimony is admissible to prove foreign law. Boseman v. Connecticut General Ins. Co., supra. However, such testimony is judged by the same rules as generally apply to opinion evidence of any expert. It is only in highly exceptional cases that opinion testimony of the expert type is binding on the trier

of facts, even when it is not contradicted. Morris v. United States, D.C.Tex., 1963, 217 F.Supp. 220, and cases there cited.

■ Under the principles above stated, the insurance contract and the relationship of the parties created by it should be determined by the applicable laws of Mexico to the extent that they were proved to the Court's satisfaction. Where such proof was inadequate, it will be presumed that the laws of Mexico and of Texas were the same. The policy carried territorial and time limits on collisions involving the insured automobile; but there were no such limits on the relationship and responsibilities of the parties in the event the automobile was in a collision in Mexico during the three day period covered by the policy. It is immaterial in this case whether the question of the duty to use due care imposed by law as an incident to the relationship created by the contract is decided under the law of Texas or of Mexico, as there is no credible evidence that the two are different. The result is that the rule in Texas will be applied.

The evidence offered to prove the laws of Mexico having possible application to the questions involved in this case consisted of some of the federal statutes of that country and of the testimony of a witness offered by the plaintiff as an expert on Mexican law. It is concluded from such evidence that insurance contracts in Mexico are generally governed by the federal statutes and the reported decisions of the federal and state courts there. All of the statutes of Mexico offered in evidence were established to the Court's satisfaction either by stipulation of the parties in the pre-trial order or during the trial, or by the plaintiff's witness mentioned above. The opinion evidence of that witness is accepted only to the extent indicated herein. The witness was a native of Germany and studied law there. He left Germany during the period of the exodus in the middle thirties, and has lived in California since 1939. He has never obtained a license to practice law anywhere, and his inability or failure to do so was not explained. The only official recognition of his law study was the action in 1960 of his native state of Bavaria in conferring on him the honorary title of "Landgerichstrap", which means Judge of the Superior Court. The honorary appointment was given, to use his words, in "the course of what is called 'restitution' ". He is foreign law librarian for one of the large county law libraries in California, which has a collection of books on the laws of some foreign countries, including Mexico. He has had no formal education in the Spanish language; but he has studied it on his own to the extent that he considers he can read and translate it, though he cannot speak it well. He has written "articles on the law of the Republic of Mexico", and has testified in two cases on the laws of that country as well as in one case on those of Norway. There was no indication of the nature of such writings and testimony or that they had any relation to the questions involved in this case. As far as the evidence goes, the articles might have been of such general nature that a government professor could have written them. A good lawyer or law professor from Mexico could have been produced at practically the same expense; and a deposition of one of them would have cost considerably less. In a case involving questions of foreign law, a party owes the court the duty of producing an expert witness whose learning and experience equal or surpass his willingness. It takes more than some schooling in law, custody of law books, a general interest in the subject, and a willingness to testify on any phase of the laws of any foreign country to make a real expert witness on whose opinions a court can rely with reasonable safety. How much attention would a court normally pay to a layman of this witness' stature on the laws of this country on the questions here involved, much less on the laws of a foreign country whose language he has not mastered? This witness was sincere and willing; and, as is often the case with

opinion witnesses, his testimony appears much stronger on paper than it did when he was giving it. In concluding that the testimony was not persuasive, except to the extent expressly stated herein, the Court took into consideration what he learned from observation of the witness, including his obvious doubt and lack of assurance while testifying. Morris v. United States, D.C.Tex., 217 F. Supp. 220, 229. Where the testimony of this witness is not expressly accepted and no Mexican statute on the subject was admitted in evidence, it will be considered that there is an absence of proof on the question and that the Mexican law is the same as that of Texas.

The following statutes of Mexico were satisfactorily established as being all of the possibly applicable statutes of that country in force at the times material in this case:

### "LAW GOVERNING INSURANCE CONTRACTS,
of 1935, as amended."

"Art. 25. If the wording of the policy of its modifications do not agree with the offer, the insured may request the corresponding correction within thirty days following the date on which the policy was received. After this period has elapsed, the stipulations of the policy or its modifications shall be considered as accepted."

"Art. 59. The insurance company shall be liable for all contingencies having the characteristics of the risk the consequences of which it has covered, unless the policy definitely excludes certain specified occurrences."

"Art. 78. The insurance company shall be liable for the loss, although it may have been caused by negligence of the assured, and the policy may only contain the clause relieving the company of liability in the case of culpable negligence."

"Art. 79. The insurance company shall be liable for loss and damage caused by persons for whom the assured is civilly liable, but the clause mentioned in the foregoing Article shall be allowed in the policy."

"Art. 145. In liability insurance the company is obligated to pay the indemnity which the assured owes to a third as the result of a happening which caused a damage provided for in the insurance contract."

"Art. 146. Failing agreement to the contrary, the expenses which result from proceedings brought against the assured shall be borne by the company."

"Art. 147. Liability insurance grants the right to the indemnity directly to the damaged third person, who shall be considered as beneficiary of the insurance from the moment of the loss.

"In case of death of the latter, his right to the insurance amount shall be transmitted by way of succession, unless the law or the contract which establish for the assured the obligation to indemnity, specifies the family members of the deceased to whom the indemnity must be paid directly without the need of estate proceedings."

"Art. 148. No acknowledgment of indebtedness, compromise or any other act of legal significance of a similar nature, made or agreed upon without the consent of the insurance company, may be used against the latter. The admission of the existence of a fact cannot be deemed to be the acknowledgment of liability."

"Art. 149. If the third is indemnified wholly or in part by the assured, the latter must be reimbursed proportionally by the company."

"Art. 150. The notification concerning the occurrence of the fact which gives rise to liability, must be given as soon as the indemnity is demanded from the assured. In case of a civil or criminal proceeding,

the assured shall furnish the insurance company with all the data and proofs necessary for·the defense."

\* \* \* \* \* \*

### "THE OBLIGATION, PART 1— CONTRACTS"

"Art. 1796. Contracts are projected by mere consent except those which must be closed in a form established by the law. From the time when they are projected they obligate contracting parties not only to comply with that which was expressly stipulated, but also for the consequences which, according to their nature, are in conformity with good faith, use or law."

 Applicable statutes in force at the time of the making of an insurance contract are as much a part of· the contract as if copied in it, and they must be considered in construing it. First State Bank of Temple v. Metropolitan Casualty Ins. Co. of New York, 1935, 125 Tex. 113, 79 S.W.2d 835, 98 A.L.R. 1256; National Mutual Cas. Co. v. Lowery, 1941, 136 Tex. 188, 148 S.W.2d 1089; Sunshine Bus Lines v. American Fidelity & Cas. Co., 5 Cir., 1935, 75 F.2d 426. All of the federal statutes of Mexico quoted above, with the exception of Art. 1796, will therefore be considered as integral parts of the Jernigan policy. Art. 1796 deals with the subject of "Contracts" generally; and without anything more than the testimony of the law librarian about its application or relation to insurance, the Court will not read it into this insurance policy. It has long been recognized that in some instances the general law of contracts does not apply to insurance policies. The following statement by Professor Woodruff is frequently quoted in this connection: "What do they know of the law of the insurance contract who only the law of contract know?" Satz v. Massachusetts Bonding & Ins. Co., 1926, 243 N.Y. 385, 153 N.E. 844, 846, 59 A.L.R. 606, by Pound, J. See also 105 U. of Pa. Law Rev. 925 (1957).

 When Art. 147 of the Mexican federal statutes is read into the Jernigan policy, Bostrom is in privity to the insurance contract so as to entitle him to sue the defendant insurance company. House v. Houston Waterworks Co., 1895, 88 Tex. 233, 31 S.W. 179, 28 L.R.A. 532, recently cited with approval by Judge Brown in McClendon v. T. L. James & Company, 5 Cir., 1956, 231 F.2d 802, 805, is still generally regarded as one of the leading cases in Texas on this proposition. The test for determining privity in a suit by an injured third party on a tort growing out of a contractual relation between the defendant and another party, as laid down in the House case, is whether the contract was "made for the purpose of benefitting him (plaintiff) or a class to which he belongs." The statute leaves no question that Bostrom was a member of the class intended to be benefitted by the policy. The holding that a third party injured by an insured automobile may sue the liability insurance company to recover the amount of a judgment against the insured is consistent with the generally accepted practice in Texas. Seaton v. Pickens, 1935, 126 Tex. 271, 87 S.W.2d 709, 106 A.L.R. 512, opinion adopted by Texas Supreme Court; Womack v. Allstate Ins. Co., 1956, 156 Tex. 467, 296 S.W.2d 233; Commercial Standard Ins. Co. v. Ebner, 1950, 149 Tex. 28, 228 S.W.2d 507. The judgments of the appellate courts in each of those cases would have been meaningless unless the injured third party had the right to sue the insurance company to collect a judgment for personal injury damages he had obtained against the insured. The defendant claims that Art. 147 of the Mexican statutes and the Texas rule contemplate only suits by the injured third party to recover from the insurance company amounts within the limits of the policy. There is no doubt that injured third parties have the right to bring such actions on the contract; but the test laid down in the House case recognizes the same right of an injured third party

to bring suit on a tort growing out of the relationship created by a contract.

The provisions of the Jernigan policy, construed in connection with the applicable statutes of Mexico, are adequate to create the status recognized by the courts in G. A. Stowers Furniture Co. v. American Indemnity Co., Tex.Com.App., 15 S.W.2d 544, and Fidelity & Casualty Co. of N. Y. v. Robb, 5 Cir., 1959, 267 F.2d 473, and in the cases following them. The policy indemnified Jernigan against loss in the amounts stated caused by the insured vehicle within the limits of the Mexican Republic during the specified three day period. The insured was required to give prompt notice of any claim, and was prohibited from making any acknowledgment of liability without the consent of the insurer. Arts. 148 and 150, supra. The company was given the absolute right to control settlement of claims covered by the policy. Art. 148, supra. While there was no express obligation to defend litigation, the assured was under duty to "furnish the insurance company with all the data and proof necessary for the defense." Art. 150, supra.

Since there is no credible proof on the Mexican law relative to the status created by the policy read with the governing statutes of that country, and to the duties implied by reason thereof, it will be presumed that such law and that of Texas are the same. It is now well settled in this State by the Stowers case, supra, and by the other authorities following it, that where an automobile public liability policy surrenders to the insurance company the control of settlement of claims within its coverage, the company assumes the responsibility to act as the exclusive agent of the assured in the matter of settlement. It is readily apparent that the company has a conflict of interest, and cases cited on the question of its liability have to be examined carefully on account of the divergence of opinion on the degree of care required of the company while acting in its fiduciary capacity. Most of the states in the Fifth Circuit

and a majority of the states in the other circuits follow the good faith rule, while Texas and the remaining states are committed to the negligence rule. Brown v. United States F. & C. Co., 2 Cir., 1963, 314 F.2d 675, 677, says that, "Much ink has been spilled in an effort to define and distinguish the rule of negligence from the rule of bad faith." There is no doubt, however, that the rule now well established in Texas requires that the insurance company, while acting in its fiduciary capacity, must use that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances, giving the rights of the insured at least as much consideration as it gives its own. G. A. Stowers Furniture Co. v. American Indemnity Co., supra; Fidelity & Casualty Ins. Co. of New York v. Robb, 5 Cir., 1959, 267 F.2d 473; Highway Ins. Underwriters v. Lufkin-Beaumont Motor Coaches, Tex.Civ.App.1948, 215 S.W.2d 904, 927, err. ref., n. r. e.; Jones v. Highway Ins. Underwriters, Tex.Civ. App.1952, 253 S.W.2d 1018, err. ref., n. r. e.; Chancey v. New Amsterdam Cas. Co., Tex.Civ.App.1960, 336 S.W.2d 763. See also: Keeton, "Liability Insurance and Responsibility for Settlement", 67 Harv.L.Rev. 1136 (1954), and Annotations: 34 A.L.R. 730, 37 A.L.R. 1484, 43 A.L.R. 326, 71 A.L.R. 1467, 131 A.L.R. 1499, and 40 A.L.R.2d 168. In this State, the good or bad faith of the insurer is only a factor to be considered along with the other circumstances to determine whether the company acted negligently.

The area embraced by the due care or negligence rule is important in this case. The defendant insists that it could not have been negligent because it was under no duty to investigate, settle or defend, and because the offer of settlement was never communicated to it. The duty to defend might well be implied from the policy and the statutes, particularly in view of the language of Art. 150 that, "In case of civil or criminal proceeding, the assured shall furnish the insurance company with all the data and proofs necessary for the defense." How-

ever, it is not necessary to decide that question, in view of the fact that the company was vested with the right to control the settlement of any claims within the coverage of the policy. The arbitrary or negligent use of that power alone could ruin an insured financially. Douglas v. United States F. & G. Co., 1924, 81 N.H. 371, 127 A. 708, 37 A.L.R. 1477, which was the foundation for the decision in the Stowers case and was quoted with approval in the Robb case, spoke of the importance of the control of settlement in this language:

"To hold that under such an agreement as this the insurer owes no duty to the insured would create the situation depicted by the court in Rumford Falls Paper Company v. [Fidelity & Cas.] Company, 92 Me. 574, 583, 43 A. 503, 505. *Thus the assured helplessly awaited the determination of the question whether in that instance its policy of indemnity was to be a shield in its own hands, or a sword in the hands of its antagonist.*" (Emphasis added).

The Rumford Falls Paper Co. case cited in the above quotation referred to the provisions giving the insurance company control over settlements as "rigorous stipulations".

 The duty to use due care to settle the Bostrom claim within the limits of the policy existed irrespective of any duty to defend a law suit. The purpose of a settlement is to prevent litigation, if possible. The obligation to make an investigation is apparent from the policy and the statutes above quoted. Even in the absence of any other provisions, it would be necessarily implied from the duty to exercise ordinary care in attempting to negotiate a settlement. It would be difficult to appraise the settlement value of a case without an investigation. The fact that the offer of settlement was not communicated by the insured to the company does not bar plaintiff's right to recover. The charge here was not that the defendant negligently rejected an offer of compromise,

but that it was negligent in not initiating and attempting to bring about a settlement. The defendant's letters show conclusively that it consistently denied all liability in connection with the Bostrom claim, and said that it had paid all the money it was going to pay as a result of the collision involving the Jernigan car. Communication to it of the offer would have accomplished nothing. The settlement offer was admitted for the purpose of showing that an attempt by the defendant to settle the Bostrom claim within the policy limits would not have been futile. While the Stowers case involved only the question of negligence in rejecting a firm offer of settlement, the Robb and the Chancey cases, supra, make it clear that the relationship created by a policy giving the insurer the exclusive control over settlements imposes the duty to initiate negotiations for settlement, to negotiate and to settle, and to exercise ordinary prudence in the performance of such duties. In the Chancey case, the Court, after quoting from the opinion in the Stowers case, said:

"It will be noted that nowhere in the opinion does the court use language to distinguish between the insurer's duty to negotiate and settle. No case has been cited, and we have found none which makes such a distinction. The ultimate responsibility of the insurer to the insured is to exercise such care and diligence which an ordinary, prudent person should exercise in the management of his own business. We can not agree with appellant's contention that the duty to negotiate is separate and apart from the duty to settle. *It is our view that the duty to settle implies the duty to negotiate. These two duties can not be separated as far as the basic obligation to the insured is concerned.* It is difficult to see how any controversy could be settled without some measure of negotiation. We therefore overrule appellant's Points 1 and 2." 336 S.W.2d, at 765. (Emphasis added).

In view of the defendant's contentions, it will be necessary to determine its liability on the basis of whether its negligence was based on misfeasance or nonfeasance, and, if nonfeasance, whether it can be held liable therefor in this character of tort action. It says that there was no misfeasance because it never entered upon the performance of any duties under the policy in connection with the Bostrom claim, and therefore any negligence on its part is based on nonfeasance and does not come within the Stowers doctrine.

The Court cannot ride along with the defendant in its contention that the Stowers doctrine makes a distinction between negligence predicated on misfeasance and that based on nonfeasance; but it will first dispose of the question of whether there is evidence showing negligence in the form of misfeasance.

The Court is of the opinion that the evidence is sufficient to establish that the defendant did enter upon the performance of its duties under the Jernigan policy in connection with this claim and that it was negligent in respect thereto. The facts already related show that shortly after the collision the defendant assumed and exercised full authority over any possible claims arising out of the occurrence. It investigated and negotiated for eight days, and then settled with Jernigan and the bus company. It concluded that it was not liable on the Bostrom claim, and maintained that position in its correspondence with Bostrom as well as the insured. Under the circumstances of this case, it has no right to claim now that it atomized the inquiry by investigating some claims and ignoring others. Neither did it have the right to assume control of the matter and abandon it to the injury of the parties for whose benefit the contract was made, without suffering the consequences for its negligence in so doing. It had to make some investigation into the Bostrom claim to have a basis for its position that he was a passenger in the insured vehicle, and that, as such, he was excepted from the coverage of the policy.

Its duty to use due care extended not only to the facts surrounding the collision itself, but also to the extent of policy coverage. Just as great damage could result from the negligence of an insurance carrier in failing to determine the true extent of the coverage as might follow from its negligence in misjudging the question of the legal liability of the insured or the extent of the injuries to the third party. The evidence in this case, then, is adequate to support the jury's findings even if the defendant's liability were limited to negligence based on misfeasance.

The law in Texas, however, appears to be that in cases of this character the insurance company is liable for its negligence, whether it is in connection with the performance or nonperformance of its fiduciary duties. The Texas cases making up the Stowers doctrine do not make any distinction between negligence based on misfeasance and that on nonfeasance. They hold that the insurance contracts in question created a relationship of principal and agent as between the insured and the insurer, and that by reason of that fiduciary status, the agent was under duty to act with due care. They say that "his conduct will be subject to closer scrutiny than the ordinary agent, because of his adverse interest", and that the fact that it is possible for the insurer to lose only a part of the claim, although it has the exclusive control over the settlement, with the balance being imposed on the insured who has surrendered the right to settle, "is an added reason for holding the defendant to *the use of reasonable care in the exercise of its exclusive control over the negotiations.*" (Emphasis ours). Fidelity & Casualty Ins. Co. of New York v. Robb, 5 Cir., 1959, 267 F.2d 473, 478–479, quoting with approval from Douglas v. United States F. & G. Co., supra. There is nothing about the language quoted, or the opinions from which it is taken, which implies that the use of reasonable care in the exercise of the company's exclusive control over the settlement negotiations is confined only

to the *manner of performance* of duties actually undertaken. No reason exists for such an implication.

The defendant bases its contention upon the old common law rule that an action of trespass on the case would lie for negligence in the performance of duties under a contract, but that a suit for damages resulting from a mere nonperformance of such duties had to be in the nature of an action of assumpsit for breach of contract. A good summary of the rule and its underlying reasons, of the exceptions to it, and of the early cases on the subject appears in the annotation in 12 L.R.A.,N.S., at 924, et seq. Most of the cases cited grew out of contracts whereby the landlord agreed to repair leased premises. The annotation states on page 929:

"There is a very important distinction between negligence as misfeasance and negligence as nonfeasance, in the breach of a contract, in determining whether an action *ex delicto* will lie therefor. As above shown (III., a), the rule undoubtedly is that such an action will lie for negligent misfeasance in the performance of the thing agreed to be done. But as undoubtedly is it the rule that such an action will not lie for a negligent nonfeasance in the performance of a contract."

Even at the time of this early annotation, the courts were applying the distinction only to those cases not involving a fiduciary relationship or public policy. The following is quoted from the annotation at pp. 924–925:

"In order to keep the question under discussion sharply outlined, and to bring out clearly the principle involved, this note has been limited to cases where there was an express contract, and of such a nature as to stand by itself, and not to fall within any *general lines of contracts controlled by principles of public policy, such as the transactions between carriers and patrons, doctors and patients, lawyers and clients,* *tradesmen and customers, bailors and bailees and other similar relations.* It is true that in these cases the underlying principle is the same as in the cases collated; but, as in most of these transactions the breach of the contract is in the nature of a breach of the implied contract or legal duty to use care or skill, etc., which public policy raises up as an accompaniment to the real contract, the common practice has come to be, without any question as to the regularity thereof, to sue for the injuries resulting from the violation of this implied contract or legal duty, and to waive the breach of contract; and it is only in exceptional cases that the wrong or violation of the implied contract is waived, and suit is brought upon the breach of the real contract. Therefore, the only way in which to discover the principle which lies at the root of this practice is to go back of these cases and take those where they are contracts not governed by these well-recognized rules of public policy, but which stand each upon its own merits, and from them, discover why and under what conditions an action *ex delicto*, rather than *ex contractu*, may be brought for a negligent breach thereof." (Emphasis added).

The following statement from a more recent work, 30 Am.Jur. Sec. 20, at p. 662, is quoted with approval by the Supreme Court of Texas in Montgomery Ward & Co. v. Scharrenbeck, 1947, 146 Tex. 153, 204 S.W.2d 508, 510:

"A contract may create the state of things which furnished the occasion of a tort. The relation which is essential to the existence of the duty to exercise care may arise through an express or implied contract. Accompanying every contract is a common-law duty to perform with care, skill, reasonable expedience and faithfulness the thing agreed to be done, and a negligent failure to observe any of these con-

ditions is a tort, as well as a breach of the contract. In such a case, the contract is mere inducement creating the state of things which furnishes the occasion of the tort. In other words, the contract creates the relation out of which grows the duty to use care. Thus, a person who contracts to make repairs can be held liable for his negligence in doing the work. * * * *The sound rule appears to be that where there is a general duty even though it arises from the relation created by, or from the terms of a contract, and that duty is violated, either by negligent performance or negligent nonperformance, the breach of the duty may constitute actionable negligence."* (Emphasis ours).

The Montgomery Ward & Co. case was a tort action based on negligence both in failing to perform contractual duties and in the manner in which some of the duties were executed. In that connection, the Supreme Court said 204 S.W.2d at page 510:

"* * * While these alleged specific acts of negligence are negative, nevertheless torts may be based on nonfeasance or omissions to act as well as on acts of commission. * * *"

The above quotation from 30 Am.Jur. also appears in John F. Buckner & Sons v. Allen, Tex.Civ.App.1956, 289 S.W.2d 387, 396, no writ history.

The question of liability for nonfeasance negligence was not as clear cut in the Montgomery Ward & Co. case as might be desired, because misfeasance negligence was also involved. However, the inclusion of the last sentence in the quotation from 30 Am.Jur. about the "sound rule" appears to be more than an accident. The fact that the sentence in 30 Am.Jur. immediately preceding it was omitted is a strong indication that the Court deliberated over the quotation, and that the sentence giving the "sound rule" would have been also omitted except for the fact that the Court was expressly indicating its approval of it.

The following statement from 30 Am. Jur., p. 661 shows that the viewpoint expressed in the recent Texas cases is in keeping with the modern trend:

"Although, as a general rule, mere failure to perform a contract cannot serve as the basis of a tort liability for negligence; and there are authorities which state that liability for negligence in the violation of a duty imposed by contract involves misfeasance rather than nonfeasance, the tendency has been to recognize that liability for negligence may be predicated upon a lack of due care in failing to act as well as upon a negligent performance * * *"

 Even under the old strict common law rule, the defendant would be liable for negligent nonperformance of its duties to initiate, negotiate and attempt to settle the Bostrom claim because the duty grew out of a fiduciary relationship and because public policy was involved. The duty of the agent, particularly with its adverse interest, was fiduciary and is subject to the strictest scrutiny, just as would be the case of lawyers, doctors, carriers and the other classes of persons mentioned in the statement of exceptions to the common law rule already quoted from 12 L.R.A.,N.S. The Safety Responsibility Law, Art. 6701h, Vernon's Ann.Texas Civil Statutes, makes it a matter of public policy to see that persons entitled to damages by reason of negligent operation of automobiles receive a substantial payment on their claim by providing penalties on drivers for failure to have public liability insurance.

 The defendant argues that this view of holding it liable for negligent nonperformance is not in accord with the weight of authority. It is true that the majority of states have not yet accepted this theory, but the same thing can be said of the negligence rule as opposed to the good faith doctrine. To use the language of Deveny v. Rheem

Mfg. Co., 2 Cir., 1963, 319 F.2d 124, 130, "Results which are consonant with justice are not always reached by a mere counting of noses, judicial or otherwise." The rule holding an insurance carrier liable for negligence, whether based on misfeasance or nonfeasance, in the exercise of its exclusive control over settlements and the negotiations therefor is the just one. In this type of case, it is just as important to have a *rule that will compel action* as it is to have *one to regulate action after it has begun*.

McClendon v. T. L. James & Co., 5 Cir., 1956, 231 F.2d 802, is distinguishable from this case on each of the following grounds: (1) It was controlled by the Louisiana law which does not recognize the right to bring a tort action for the negligent nonperformance of a contractual duty; (2) there was no privity between the plaintiff and the defendant; (3) there was no fiduciary relationship or public policy involved.

■ For all of the reasons stated, the evidence is sufficient to support the verdict of the jury. The findings of the jury and the uncontradicted evidence make the defendant liable to the plaintiff for the amount of the judgment he obtained against the insured. The defendant's motion for judgment non obstante will therefore be overruled, and judgment will be entered for the plaintiff.

It is undoubtedly a hardship for a company to get a judgment against it for $270,000.00 on a $5,000.00 and $10,000.00 policy; but it is likewise a hardship on an insured to have a $270,000.00 judgment against him when he thought he had taken some steps to protect himself with insurance. The company in this case is the party which could have disposed of the claim within the limits of the policy. The present situation is its own making.

The defendant's motion to set aside the verdict embraces the grounds that the Court erred in overruling its motion for continuance, and that the Court should now grant a new trial to enable the defendant to prove that statutes of Mexico existed requiring injured third parties to submit themselves to designated officials in Mexico to attempt to arbitrate claims arising out of collisions involving automobiles covered by public liability insurance. The Court is of the opinion that neither ground furnishes justification for setting aside the verdict.

■ The motion for continuance was based on the absence of a citizen and resident of Mexico who acted as agent for the defendant in the issuance of the policy. It was alleged that he would testify that he furnished a sheet of paper in addition to the one offered in evidence as the Jernigan policy, and that it excepted passengers in the insured automobile from coverage. No such sheet was sent to Bostrom's attorney when the defendant mailed him a copy of the policy. Jernigan testified that it was not a part of the policy given him. The Court felt that the defendant should have used some diligence to get that evidence, if it existed. There was no request for admission, and no effort was ever made to take the deposition of the witness. The motion for continuance was filed after the plaintiff had made his trip from Minnesota to Fort Worth for the trial and after the leading counsel for the plaintiff had come from Illinois to Fort Worth. The defendant had already received all the leniency from the Court that it had a right to expect. Its first answer was prepared and signed by someone in Mexico, who was an officer of the company and apparently a layman. It did not purport to comply with the rules. The Court refused to grant the plaintiff's request for judgment, and gave the defendant considerable extra time to employ a lawyer licensed in the district and to file an answer. A pre-trial hearing was then set; and when the attorneys for the parties appeared, counsel for the defendant requested a postponement on the ground that he had been unable to get from his client in Mexico what he thought was all the necessary information. The pre-trial hearing was re-set for a date about a month later, and again

it was postponed at the request of defense counsel. The defendant had more than two months notice of the date of the setting of the trial on its merits. It had been *mañana* all the way, and it was still *mañana* on the morning the case was called for trial. The Court had no way of knowing anything about the doctor who signed the certificate of illness of the witness. The alleged illness occurred on the eve of the trial. The Court could not be reasonably assured that the witness would ever be present. It would have been an abuse of discretion and an injustice to the plaintiff to have granted the motion under the circumstances.

■ No adequate reason was shown for the defendant's failure to have available at the trial the statutes offered as a basis for its motion to set aside the verdict.

This opinion will serve as findings of fact on matters within the province of the Court as trier of facts in this jury case, and as conclusions of law under the provisions of Rule 52(a), F.R.Civ.P.

Judgment and order will be entered in compliance with this opinion.