Gary **GREENBERG** et al.

v.

**MOBIL OIL CORPORATION** et al.

**Civ. A. No. 4–1093.**

United States District Court,
N. D. Texas,
Fort Worth Division.

Aug. 5, 1970.

David M. Kendall, Jr., J. M. Hoppenstein, Dallas, Tex., for plaintiffs.

Ronald L. Neill, Dallas, Tex., for defendant Mobil Oil Corp.

Buddy Robinson, pro se.

Jerry Don Tolly, pro se.

## MEMORANDUM OPINION

BREWSTER, District Judge.

Gary Greenberg and his father filed this suit against Mobil Oil Corporation, Buddy Robinson and Jerry Don Tolly for damages for personal injuries sustained by Gary Greenberg when he was a minor. After a jury trial, the plaintiffs have filed a motion for judgment n. o. v., or in the alternative for a new trial.

This case grew out of an unfortunate incident where Jerry Don Tolly, one of the defendants, shot Gary Greenberg, one of the plaintiffs, with a small caliber pistol. The injury from the gunshot wound was critical, but an operation brought about a miraculous recovery that enabled the injured party even to participate in college intramural athletics, including football, within a little more than six months after he was wounded.

Tolly was working as the night attendant in a filling station which sold Mobil products. Robinson was the operator of the station. The defendants [1] claim that Robinson was an independent contractor. The contractual documents fully support that position. The plaintiffs contend that the contractual instruments are a mere sham, and that Robinson was operating the station as an employee of defendant, Mobil Oil Corporation.

The case has been tried before a jury; and, by its verdict in answer to special interrogatories, the jury found:

1. Tolly fired the bullet which inflicted the injury without intending that it strike Gary Greenberg.

2. Tolly was not acting within the scope of his employment for Robinson in firing the shot which struck Gary Greenberg.

3. At the time of the shooting, Robinson was operating the filling station in question as an independent contractor.

4. $50,000.00 would be the amount, if paid now in cash, that would be required to compensate Gary Greenberg for his injuries.[2]

5. No exemplary damages should be awarded.

---

1. Robinson and Tolly were financially unable to employ counsel, and each appeared in all phases of the case.

2. This Court usually follows the practice of submitting the question as to the amount of damages in a form which

Each of the defendants is entitled to a judgment on the verdict unless judgment for the plaintiffs is required as a matter of law.

The plaintiffs claim in their motion now before the Court that the undisputed evidence entitles them to a joint and several judgment against all the defendants as a matter of law. In the alternative, they say that they are entitled to a judgment severally against the defendant Tolly, notwithstanding the verdict, because his plea of guilty to a charge of assault to murder growing out of this transaction collaterally estopped him to deny his intention to shoot the plaintiff, Gary Greenberg. Further in the alternative, they ask that they be granted a new trial. The Court has concluded that the motion should be overruled in its entirety for each of the following reasons:

A. In regard to the motion for judgment n. o. v.—

1. Mobil is entitled to judgment (1) as a matter of law, (2) upon the jury finding that Robinson was operating the station as an independent contractor, and (3) upon the jury finding that Tolly fired the bullet which struck Greenberg without intending to hit him.

2. Robinson is entitled to judgment (1) upon the jury finding that Tolly was not acting within the scope of his employment in firing the shot in question, and (2) upon the jury finding that Tolly fired the bullet which struck Greenberg without intending to hit him.

3. Tolly is entitled to judgment upon the jury finding that he fired the shot which struck Greenberg without intending to hit him.

4. Each of the jury findings mentioned in 1, 2 and 3 above is supported by the evidence.

B. In regard to the motion for new trial—

1. There was no reversible error in regard to the plaintiffs' action against any of the defendants.

2. Any procedural error during the trial would not warrant a new trial as to Mobil because (1) it was entitled to judgment as a matter of law, and (2) such error could not have affected each of the two jury findings which independently entitled Mobil to a judgment on the verdict.

3. Any procedural error during the trial would not warrant a new trial as to Robinson because no such error could affect each of the two jury findings which independently entitled Robinson to a judgment on the verdict.

Mobil filed a motion for summary judgment in the early stages of the case, and renewed it shortly before the trial, after discovery had been completed. In the hearing held at the first presentation, the Court informed the parties that he was of the opinion that such a motion should not be granted on the basis of documents supported only by affidavits in a case of this kind where the facts were involved, and that the motion could be presented again after development of the evidence by discovery. At the second presentation, the Court decided that, although the proof during the discovery procedure was fairly complete, it would be advisable to require a full development of the facts in an evidentiary trial. The motion was carried along with the case.[3]

requires an answer, even though the liability issues are found in favor of the defendant. There are times when this practice will avoid a second trial. One instance would be where each party argues after verdict that he is entitled to a judgment on the verdict; another would be where one of the answers is subject to being disregarded for lack of evidence to support it. This case is a good example of the soundness of the practice.

3. This course was decided upon primarily on account of the plaintiffs' estoppel theory. One of the grounds upon which they sought to hold Mobil was that it was estopped to deny that the filling station here involved was being operated by it. They claimed that the manner of operation of various other Mobil stations and the nature of Mobil's national advertising induced Greenberg to stop at that particular station in preference to others on the

Discovery was extensive, and approached the point of being burdensome to Mobil. The plaintiff's interrogatories and motion for production of documents covered the waterfront. The first set of interrogatories contained 70 numbered questions, and the second set, 35 numbered interrogatories. Some of the interrogatories had several subdivisions. They dealt not only with the operation of the filling station in question, but with the manner of operating *"Mobil gasoline service stations throughout the United States."* (Emphasis supplied). Demand was made for the production of *"copies of all advertising material, used in all national advertising programs* carried out by MOBIL OIL CORPORATION during the period that BUDDY ROBINSON operated a Mobil Gasoline Service Station." (Emphasis supplied). Mobil objected to the scope of some of plaintiffs' discovery; but the Court resolved the doubts, as far as was reasonably possible, in favor of producing the information and laying the cards on the table. Mobil complied.

Mobil moved for an instructed verdict at the close of plaintiffs' evidence and again at the close of all the evidence. One ground of the motions was that the evidence showed as a matter of law that Robinson was an independent contractor, and not an agent of Mobil, in the operation of his filling station at the time in question. In connection with the motion presented at the close of the evidence, the Court stated that he was of the opinion that Mobil was entitled to judgment as a matter of law, but that he would follow the recommended practice of submitting to the jury possible fact issues relating to Mobil so as to avoid the necessity of a remand if it should be later determined that liability did not exist as a matter of law.[4] The jury's finding in favor of Mobil on the independent contractor issue makes it unnecessary for the Court to follow up on Mobil's motion for instructed verdict; but the plaintiffs' motion for new trial requires that Mobil's liability as a matter of law be discussed in connection with the question of whether any procedural error in regard to Mobil was prejudicial.

Since this is a diversity action, liability must be determined under the law of Texas. The Court's opinion that Mobil was not liable as a matter of law is based upon Texas cases such as Carter Publications v. Davis, Tex.Civ.App., 68 S.W.2d 640, writ refused; Texas Company v. Wheat, 140 Tex. 468, 168 S.W.2d 632; Humble Oil & Ref. Co. v. Martin, 148 Tex. 175, 222 S.W.2d 995; Frye v. Sinclair Oil & Gas Co., Tex.Civ. App., 249 S.W.2d 102, writ refused; Mid-Continent Freight Lines, Inc. v. Carter Publications, Inc., Tex.Civ.App., 336 S.W.2d 885, writ refused; McGee v. Phil-

occasion in question. The Court was never impressed with that theory, but experience has taught that caution should be used in making summary disposition of theories founded on a claim of estoppel growing out of an involved factual situation. The estoppel theory faded out as the evidence developed that the plaintiffs' party stopped at this particular station only for the purpose of using the telephone and the rest room. They never intended at any time to buy anything there. The evidence showed that the selection of this station was made on the basis that it was the closest one when a call of nature hit one or more of the group travelling with Greenberg from Dallas to Fort Worth on the toll road. During the discussion after the close of the evidence between counsel and the Court about the charge, counsel for plaintiffs, with commendable frankness, admitted that the evidence did not raise the estoppel theory.

4. "Boston moved for an instructed verdict at the conclusion of the evidence. The court was of the opinion that Boston was entitled to judgment as a matter of law but followed the recommended practice of submitting possible fact issues to the jury so that remand for a new trial might be obviated if on appeal this court found him in error." Malone and Hogan Hospital Foundation v. Boston Insurance Co., 5 Cir., 378 F.2d 362 (1967). In that case, the jury returned a verdict on special interrogatories against Boston Insurance Company, and the Court entered judgment non obstante for it. The judgment was affirmed.

lips Petroleum Company, Tex.Civ.App., 373 S.W.2d 773, err. ref. n. r. e.; Newspapers, Inc. v. Love, Tex.S.Ct., 380 S.W. 2d 582. The evidence in this case conclusively established the dealer type of relationship between Mobil, lessor, and Robinson, lessee, under which Robinson was the owner of the filling station business and had control over the details of the operation of it. The fact that the contracts required the maintenance of certain minimum standards at the station, that Mobil conducted voluntary schools for its lessee-operators, and the fact that at times it made helpful suggestions for their mutual benefit, did not change the relationship between Mobil and Robinson to that of employer and employee. The following is quoted from discussions by the Supreme Court of Texas of this type of relationship in Humble Oil & Ref. Co. v. Martin and Texas Company v. Wheat, both supra.

Humble Oil & Ref. Co. v. Martin, 222 S.W.2d at p. 998:

"The evidence above discussed serves to distinguish the instant case from Texas Company v. Wheat, 140 Tex. 468, 168 S.W.2d 632, upon which petitioner Humble principally relies. In that case the evidence differed greatly from that now before us. It clearly showed a 'dealer' type of relationship in which the lessee in charge of the filling station purchased from his landlord, The Texas Company, and sold as his own, and was free to sell at his own price and on his own credit terms, the company products purchased as well as the products of other oil companies. The contracts contained no provision requiring the lessee to perform any duty The Texas Company might see fit to impose on him, nor did the company pay any part of the lessee's operating expenses, nor control the working hours of the station. * * *"

Texas Company v. Wheat, 168 S.W.2d at p. 635:

"The contract between the company and Gossen on its face, as evidenced by the written instruments, created the relation of landlord and tenant, and not the relation of master and servant, and we find nothing in the evidence to indicate that the contract, as written, was intended as a subterfuge or sham to conceal the existence of a different relationship. The fact that Gossen paid rent, bought and paid for the merchandise, bore all the expenses of operating the station, employed and controlled the employees in the discharge of their work, stood the losses and appropriated the profits is consistent with the relationship of landlord and tenant, and inconsistent with that of master and servant.

"Neither do we find anything in the evidence to justify an inference that after the contract had been entered into it was abandoned, and that the company assumed charge of and actually controlled the details of the operation of the station. It is true that the company demanded that certain standards as to cleanliness be maintained in the operation of the station, and that by reason of the option to cancel the provision for reduced rent it was within the company's power to enforce obedience to its commands. But the company, as lessor, was interested in maintaining the good reputation of the station, and it had a right, as a condition precedent to the leasing of the station, to demand maintenance of such standards. It could enforce compliance with the contract in the maintenance of these standards without creating the relation of master and servant so long as it did not undertake to direct the details by which the results were to be accomplished. Cox Dry Goods Co. v. Kellog, Tex.Civ. App., 145 S.W.2d 675; Dave Lehr, Inc. v. Brown, 127 Tex. 236, 91 S.W.2d 693; Lone Star Gas Co. v. Kelly, Tex.Com. App., 46 S.W.2d 656, syl. 4; Carter Publications, Inc. v. Davis, supra. Consequently, the fact that the company demanded that the station, including the rest room, be kept clean did not create the relationship of master and servant.

"The company was interested in having prompt and efficient service rendered by operators at stations where products manufactured by it were offered for sale. Consequently, it conducted voluntary schools for such operators, and from time to time gave helpful suggestions at the stations. These instructions or suggestions were of mutual benefit, for they enlarged the operator's sales and increased the consumption of the products manufactured by the company. The instructions so given by the company's representatives as to how to service cars were understood by both parties to be mere suggestions, which Gossen could accept or reject as he liked. The company by giving such instructions did not undertake to authoritatively direct how the work was to be done."

■ Even if Mobil were not entitled to judgment as a matter of law, the most that could ever be said for the plaintiffs on the question of the relationship between Mobil and Robinson is that the issue was one of fact, and that the jury's finding thereon was sufficient, in and of itself, to require that judgment be entered for Mobil. The plaintiffs had the burden of proving that Robinson was an agent of Mobil in the operation of the filling station. With the written contracts in evidence which established on their face that Robinson was an independent contractor, the only way plaintiffs could discharge their burden of

proof was by showing that the contracts were a sham and subterfuge created for the purpose of defrauding the public. The plaintiffs have been given more opportunity than has usually been afforded litigants similarly situated in this kind of case [5] to get a jury determination of this issue. They failed to convince the jury on it. "The existence of fraud is, ordinarily, considered to be a question of fact, for the jury, or for the court acting as the trier of facts * * *" 26 Tex.Jur.2d, page 126. It would be a rare case of this nature, with the issue hotly contested, where a court would hold that sham and fraud were established as a matter of law. The Texas cases already discussed show that the only instances where the courts have held that the issue was decided as a matter of law were ones where the decision was in favor of the independent contractor relationship.

■ The third independent ground upon which Mobil is entitled to judgment is the jury's finding that Tolly fired the bullet which struck Greenberg without intending to hit him. This is also one of the two separate grounds upon which Robinson is entitled to judgment.[6] The plaintiffs' theory was that Tolly voluntarily and maliciously fired the shot at Greenberg with the intention of seriously injuring him. Intent to injure was an essential element of plaintiffs' cause of action. That was the only theory presented by plaintiffs' re-

---

5. In similar situations in the Texas courts, the plaintiff never got the question submitted to the jury. In McGhee v. Phillips Petroleum Co., and Mid-Continent Freight Lines, Inc. v. Carter Publications, Inc., both supra, the trial courts granted motions for summary judgment. In Texas Co. v. Wheat and Frye v. Sinclair Oil & Gas Co., both supra, the oil companies were granted instructed verdicts. The plaintiffs did get to the jury and obtained favorable verdicts in Carter Publications v. Davis, supra. The appellate court reversed and remanded the judgment for plaintiff in that case. The Texas Co. case was by the Supreme Court of Texas. It is significant to note that in

the other cases the Supreme Court *refused* applications for writ of error without any such qualification as "want of jurisdiction", "want of merit", or "no reversible error". Such unqualified refusals meant that the Supreme Court adopted the opinions of the Courts of Civil Appeals as its own. Rule 483, Texas Rules of Civil Procedure; Myers v. Gulf Coast Minerals Management Corp., Tex.S.Ct., 361 S.W.2d 193.

6. Tolly is also entitled to a judgment on this finding unless his plea of guilty in his criminal case is conclusive on him. That question is discussed in the latter portion of this memorandum opinion.

quested charges.[7] As is indicated in that portion of plaintiffs' requested instruction number 3 quoted in footnote 7, "accident or innocent intention" on the part of Tolly in regard to Gary Greenberg was a complete defense to the plaintiffs' alleged cause of action. This finding of the jury is fully supported by the testimony of Tolly, and is sufficient in itself to require a judgment in favor of Mobil and Robinson.

■■ The finding that Tolly was not acting within the scope of his employment for Robinson in firing the shot which struck Greenberg is a separate and independent ground also requiring judgment in favor of Robinson. To grant the plaintiffs' request for judgment against Robinson, the Court would have to disregard this finding. The Court is of the opinion that the issue was one of fact for the jury and that the jury's finding thereon concludes the matter. In arriving at what happened, the jury was not bound to choose between the theory made only by the plaintiffs' evidence on the one hand or the defendants' evidence on the other. It could draw reasonable inferences from all the evidence it considered credible, regardless of its source. As might be expected in a case growing out of the unplanned firing of four or five pistol shots, no two witnesses in this case gave the same version of what happened. If the trier of facts accepted some of the testimony of several of the witnesses, some from the plaintiffs and some from the defendants, it was possible to arrive at any one of several different theories. One of such theories was that the motive for the shooting was purely personal on the part of Tolly, whether it was the result of malice or defensive panic. If it was personal and not in furtherance of his employment, the finding that the shot that struck Gary Greenberg was not fired in the course of Tolly's employment by Robinson is supported by the evidence. The plaintiffs' theory that the shooting was malicious and without any semblance of justification is more consistent with this theory than with the one that he thought he was doing something to protect Robinson's property.

The jury finding that Tolly did not intend to shoot Gary Greenberg entitles Tolly to a judgment, unless his conviction on his plea of guilty to the state court criminal charge of assault with intent to murder Gary Greenberg with malice is conclusive on him on the assault and battery issue in this case. The plaintiffs claim that it is so conclusive.[8] The plea

7. The plaintiffs requested the following interrogatory:
   "SPECIAL ISSUE NO. 4
   "Do you find from a preponderance of the evidence that at the time and on the occasion in question Jerry Don Tolly assaulted and battered Gary Greenberg, as that term is herein defined?"
   *     *     *     *     *
   The definition of "assault and battery" referred to in the above requested special issue was the one contained in plaintiffs' requested charge number 3 which read:
   "By the term 'ASSAULT AND BATTERY' as used herein is meant any unlawful violence upon the person of another *with intent to injure him*, whatever may be the means or degree of violence used.
   "When an injury is caused by violence to the person, the intent to injure is presumed and it rests with the person inflicting the injury to show *accident or innocent intention*." (All emphasis supplied).

   *     *     *     *     *
   In the state of the record at the conclusion of the evidence, it was established beyond question that Tolly fired a shot which injured Gary Greenberg. The parties conceded that the only contested issue on the assault and battery theory was whether the injury was the result of accident or innocent intention. The Court therefore submitted the issue in Question No. 1 inquiring whether the shot which struck Greenberg was fired by Tolly with the intention that it strike Greenberg. If the jury had answered the question in the affirmative, the Court would have considered that the plaintiffs had established an assault and battery.

8. The plaintiffs also offered in evidence a conviction on Tolly's plea of guilty to assault to murder with malice on Larry McDaniel, the owner and driver of the automobile in which Greenberg and his group were riding. There is no argument, however, that such conviction is con-

was entered on November 10, 1967, following the shooting on the previous March 4th. He was sentenced to a term of not less than two nor more than three years.[9]

■ This question is relevant only to the issue of Tolly's liability. It has no bearing one way or the other on the issue of the liability of Mobil and Robinson. They had a right to have the assault and battery issue tried on the evidence of the transaction itself, without regard to Tolly's plea of guilty. The plea was not even admissible against either one of them. It has long been the settled law in Texas that in a personal injury action against the employer of an alleged wrongdoer, inculpatory statements or admissions of the employee not part of the res gestae of the tort are beyond the scope of his employment and are not binding upon the employer unless authorized, adopted or otherwise ratified by him. Liner v. United States Torpedo Co., Tex.Com.App., 16 S.W.2d 519; West Texas Produce Co. v. Wilson, 120 Tex. 35, 34 S.W.2d 827; Miles-Sierra Co. v. Castillo, Tex.Civ.App., 398 S.W.2d 948, err. ref. n. r. e. This rule has been applied specifically to pleas of guilty of an employee to an offense growing out of the transaction where his employer is sued. Isaacs v. Plains Transport Co., Tex., 367 S.W.2d 152, no writ history; Johnson v. Empire Machinery Co., 5 Cir., 256 F.2d 479 (1958); Annotation: Conviction or Acquittal as Evidence, 18 A.L.R.2d 1287, 1312. In the Johnson case, which was on appeal from a federal

district court in Texas, the Court of Appeals said at p. 482:

"Cooper was not a party defendant. His employment was as a parts and delivery man. His authority to bind the defendant was limited to the scope of his employment. His action, several days after the accident, in paying a fine 'for following too closely' could not be introduced as an admission against his principal. See Liner v. United States Torpedo Co., Tex.Com. App., 16 S.W.2d 519; Annotation 18 A.L.R.2d 1312."

Mobil and Robinson are therefore entitled to the benefit of the jury's finding that the shooting of Gary Greenberg was accidental, regardless of whether Tolly's plea of guilty is conclusive as to him on that issue.

Since the parties in the civil and criminal actions were not the same, the plaintiffs rely upon the theory of collateral estoppel by judgment in contending that Tolly's plea of guilty is conclusive on him on the assault and battery issue. They cite four cases in support of their argument: Tomlinson v. Lefkowitz, 5 Cir., 334 F.2d 262, 263 (1964); Moore v. United States, 4 Cir., 360 F.2d 353 (1965); Seguros Tepeyac, S.A., Compania Mexicana v. Jernigan, 5 Cir., 410 F.2d 718 (1969); and Breeland v. Security Ins. Co. of New Haven, 5 Cir., 421 F.2d 918 (1969).[10] In the Breeland case, the Court of Appeals held that the question of collateral estoppel by judgment in a diversity case must be determined by the law of the state where the

---

clusive, as the facts in regard to the two shootings raised different legal issues. Tolly's explanation was accident as to Greenberg and self defense as to McDaniel.

9. The penalty then prescribed by Texas statutes for assault with intent to murder with malice was any term of years not less than two nor more than fifteen. Art. 1160, Vernon's Ann.Texas Penal Code. The sentence was made to correspond with the Indeterminate Sentence Law, Art. 42.09, Vernon's Ann. Code of Criminal Procedure.

10. The writer of this opinion is more than casually familiar with two of the cases on collateral estoppel discussed herein. He was a member of the panel which decided the *Tomlinson* case, supra, and was the trial judge in Bostrom v. Seguros Tepeyac, S.A., Compania Mexicana, D.C.Tex., 225 F.Supp. 222 (1963), affirmed in part and reversed in part, 5 Cir., 347 F.2d 168 (1965), the judgment in which was the basis for the collateral estoppel in the Jernigan case, supra.

trial court sits.[11] For that reason, the Tomlinson and Moore cases cited by plaintiffs are not applicable to the present diversity action. Each one of them was a federal income tax refund suit seeking to recover payments of civil fraud penalties, where it was held that a prior conviction of the taxpayer for willfully attempting to evade and defeat the payment of income taxes for the years in question was conclusive on him on the issue of fraud in the civil litigation. The Breeland case is not applicable here because, as a diversity action, it decided only what the law of Louisiana was on this question. Jernigan can be distinguished on many grounds, but the one hereinafter discussed will suffice. Bostrom, a passenger in an automobile got a judgment for $270,000.00 against Jernigan, the owner, for injuries sustained when the automobile collided with a bus in Mexico. Jernigan was covered by a public liability insurance policy issued to him in Mexico by a company chartered there; but the company refused to have anything to do with the Bostrom claim and litigation, even to the point of refusing to consider a proposition of settlement within the limits of the policy.[12] Bostrom, relying upon the Stowers doctrine, sued the insurance company for the full amount of his judgment against Jernigan. Upon jury findings that the insurance company was negligent in not attempting to bring about a settlement, this Court decreed that the company was liable to Bostrom for the full amount of his $270,000.00 judgment against Jernigan.[13] The Court of Appeals affirmed the recovery to the extent of the face value of the policy, but held that Bostrom, as the injured party, could not maintain the action for the excess. Jernigan then brought and successfully maintained his suit under the Stowers doctrine that led to the opinion above cited by plaintiffs.[14] In the Jernigan case, the insurance company sought to defend on the ground of certain provisions on a loose page which it claimed was attached to the policy when it was originally delivered to Jernigan. That issue had been litigated in the Bostrom case with the result that it was found that the page was never a part of the policy. The Court held in the Jernigan case that "no useful public policy is served by permitting Seguros to relitigate its rights under an insurance policy that has already been construed in a prior suit",[15] and that the company was prevented by the doctrine of collateral estoppel by judgment from doing so. As part of the basis for such holding the Court mentioned the "third-party beneficiary relationship" of Bostrom in regard to the policy. That arose from the fact that the law of Mexico, which governed the insurance policy, provided: "Art. 147. Liability insurance *grants the right to the indemnity directly to the damaged third person,* who shall be considered the beneficiary of the insurance from the moment of the loss."[16] (Emphasis added). On the appeal in the Bostrom case, the Court said of that statute: " * * * Article 147 of the Mexican law governing insurance must therefore be read into the policy. This article, consistent with the civil law generally, specially recognizes that the injured party is a third party beneficiary of the insurance contract."[17] Bostrom was, therefore, standing in the shoes of Jernigan in the portion of the suit for the face amount of the policy; and the litigation of issues relating to the construction of the policy therefore bound him, Jernigan and the company.

---

11. "The question which must now be answered is whether the prior criminal conviction for the fraud perpetrated on the insurance company is conclusive of the fraud issue in this civil suit. Because this is a diversity case, the law of the state where the District Court sat controls the questions of res judicata and estoppel. * * *" 421 F.2d, at p. 921.

12. The policy limit for any one person was $5,000.

13. 225 F.Supp. 222.

14. 410 F.2d 718.

15. 410 F.2d, at p. 727.

16. 225 F.Supp., at p. 231.

17. 347 F.2d, at p. 172.

That this was the basis of the application of collateral estoppel is made clear by the fact that, as to the portion of the suit for the excess under the Stowers doctrine, the Court allowed the issue of the company's negligence in failing to negotiate a settlement to be litigated in the Jernigan case although it had already been tried in the Bostrom action. No such comparison of the position of the State of Texas in the criminal case and that of the plaintiffs in this action can be made.

■■ The rule in Texas is that while a plea of guilty in a criminal case is admissible against the pleader in a related civil action,[18] it is not conclusive on any of the issues in the civil suit. In the Texas case of Sumner v. Kinney, supra, note 18, the Court quoted with approval the following from Abbott's Trial Evidence (2d Ed.), p. 819:

> "The conviction of defendant on a criminal prosecution for the same assault, if founded on a plea of guilty, is competent as an admission, but it is not conclusive."

On the basis of that rule, the Court upheld an instruction to the jury to the effect that the judgment of conviction on the plea of guilty "is not conclusive of defendant having committed an unlawful assault and battery upon plaintiff as charged in said complaint for the purpose of this cause, but you may consider said judgment as any other evidence in arriving at your verdict, and give it such weight and probative force as you may deem it entitled to." In that connection, the Court said: "It was proper, in the interest of the defendant, for the court to give the instruction upon the particular evidence, *else the jury might have taken it as conclusive.*" (Emphasis supplied). Since there is no case in Texas holding to the contrary, it is not necessary for this Court to try to determine what the present trend is, as the Court did in the Breeland case, supra, where the authorities in Louisiana were divided on the question.[19] Even if the federal courts were disposed to change the rule,[20] they would be confronted with the same problem under the Erie doctrine[21] as the court was in the Jernigan case, supra, when it said at 410 F.2d p. 725:

> "We have, of course, considered the possibility that Texas courts might today no longer adhere to *Culberson* [Universal Automobile Ins. Co. v. Culberson, 126 Tex. 282, 86 S.W.2d 727, 87 S.W.2d 475], and by departing from that decision might affect the result reached in the case before us. But recent attempts to seek enlightenment on state law from the Texas courts have not been successful, see United Services Life Insurance Com-

---

18. Sumner v. Kinney, Tex.Civ.App., 136 S.W. 1192, no writ history; Coons v. Lain, Tex.Civ.App., 168 S.W. 981, no writ history; Balaguer v. Macey, Tex.Civ. App., 238 S.W. 322, err. dis.; Smallwood v. Parr, Tex.Civ.App., 178 S.W.2d 610, 616, err. ref. want of merit; Canales v. Bank of California, Tex.Civ.App., 316 S.W.2d 314, err. ref.; Carrick v. Hedrick, Tex.Civ.App., 351 S.W.2d 659, no writ history; Plains Transport, Inc. v. Isaacs, Tex.Civ.App., 361 S.W.2d 919, err. ref., n. r. e.

19. The determination of what the trend is presents an interesting question. In the Breeland case (1969), the Court of Appeals for the Fifth Circuit decided that the trend was in favor of conclusiveness of the plea. Only a year before, the Court of Appeals for the Eighth Circuit said in State Farm Mut. Auto Ins. Co. v.

Worthington, 405 F.2d 683, 687: " * * The clear trend of authorities is that evidence of a guilty plea is admissible against a party in a subsequent civil proceeding but it may be explained and is not conclusive, the weight of the evidence being for the trier of facts." An editorial comment in an annotation on this subject in 18 A.L.R.2d 1311 states the general rule to be: "Evidence of a plea of guilty is not conclusive in a civil action, but may be explained by the party concerned." Many state court cases are cited in support of the rule.

20. This is not to intimate that the author of this opinion disagrees with it.

21. Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1938).

pany v. Delaney, 5 Cir. 1964, 328 F.2d 483, cert. denied, Paul Revere Life Ins. Co. v. First National Bank in Dallas, 377 U.S. 935, 84 S.Ct. 1335, 12 L.Ed.2d 298, and United Services Life Insurance Company v. Delaney, Tex.1965, 396 S.W.2d 855, 859–864, and we are therefore obliged to accept *Culberson* and *Linkenhoger* [Linkenhoger v. American Fid. & Cas. Co., 152 Tex. 534, 260 S.W.2d 884] with whatever shortcomings and contradictions they may possess. * * * "

This case is a good example supporting the rule against conclusiveness. Tolly was a man with little education, and his demeanor gave the impression that he had had very few advantages in life. He knew nothing but mule labor and the long hours he devoted to work left little time for study.[22] He had no funds to get a lawyer in this case, but came to all pre-trial conferences[23] and said nothing unless a question was asked him. It was mentioned by some one during a pre-trial conference in the early stages of the case that Tolly had pleaded guilty to the charges of assault to murder growing out of the transaction. The conference was informal, and the Judge asked him a number of questions about the matter to get an understanding of any legal problems that might arise. Without realizing the legal significance of what he was saying, Tolly related a set of facts that caused the Judge to believe that the pleas might have to be set aside in a habeas corpus hearing for lack of effective representation and misconduct of the prosecutor. Tolly was never financially able to pay his lawyer, and the lawyer told him on the morning that the cases were to go to trial that he was not going to represent him further unless he was paid. While Tolly was in a state of shock from having had the rug jerked out from under him, the prosecutor told him he was going to see that he got twenty-five years[24] if the case was contested, but that he could get off "pretty light" if he would plead guilty at that time. His lawyer said he would go ahead if the plea were guilty; and the term of sentence was then negotiated. This Judge got the impression that the lawyer was waiting to get paid before he did anything, and that he never did any work on the case. These matters were not fully developed in the trial of the present case, as Tolly did not know the importance of them and there was no lawyer to develop them in his behalf.[25] He gave only part of the picture in his testimony.

If the lawyer who appeared for Tolly on the pleas of guilty had made the slightest investigation of the facts, he could not have conscientiously entered the pleas of guilty. Tolly had never seen any of the group of five young men until they drove into the filling station a few minutes before the incident. One of them who testified in this case still looked like a hippie. McDaniel, the owner and driver of the car, lived in Dallas. The other four were attending the University of Oklahoma, and had come to Dallas with a group of thirty or more on a bus for the "annual walk-out". The night life they found in Dallas on Friday night was too dull, and this group decided to go with McDaniel in his car and spend Saturday evening at a well known dive in Fort Worth. As they neared the downtown business district, they decided to stop at a filling station.

22. The evidence showed that he frequently worked twelve to fourteen hours a day. On the occasion of the shooting, he was nearing the end of his second consecutive eight hour shift at the filling station. That would have meant sixteen hours straight that day.

23. He and Robinson were each notified personally of all conferences and hearings. A remark Tolly made during his testimony indicated that he apparently thought he had to attend.

24. Tolly did not know that fifteen years was the maximum penalty.

25. The attorney for Mobil was the only lawyer on the side of the defense. He apparently felt that anything he did to help Tolly might prejudice Mobil's position that it was not connected with the operation of the station, so he offered no help.

They left the freeway at Riverside Drive and went to the nearest one. They claim that some of them went to the restroom and one went to the pay telephone inside the station. The call was not completed, but the dime was not returned, as the telephone was out of order. There was a sign on it so stating but this party placing the call paid no heed to it. Tolly had just finished servicing a car for other people and was on the outside. Some of the group say they went to him and asked for a dime in return for the one put in the pay telephone. They say that they were very quiet about everything; and that when Tolly would not give them a dime, they started to leave. They claim that, without any provocation or justification, Tolly started shooting at them after they had started away.

■ Reason and experience do not support the story that Tolly fired the shots without cause. He was a hard working, mild mannered, humble person. He appeared to be on the meek side.[26] He had a wife and two children. He had nothing to gain and everything to lose by shooting somebody without justification. It was a matter of general knowledge in the Fort Worth-Dallas area at the time of this shooting that it was open season for hijackers on night filling station attendants and cashiers in small stores, if they were working alone. Hijackers felt that there was no longer any likelihood of getting the death penalty for murder of a victim, so many of them killed the attendant or cashier (even women) after robbing them, in order that there would be no witness to the robbery. It is not necessary, however, in this case to resort to general knowledge to understand Tolly's actions. He was the lone employee at work on the night shift. There had been five robberies of the night attendant there during the year previous to the transaction in question. On two occasions, the hijackers had knocked the attendant in the head with their pistols after they had robbed him. Tolly started keeping a small snub nose .22 caliber pistol in his pocket when he was working at night. It is no wonder that the occurrences on the occasion in question, as they appeared to him,[27] were ground for apprehension. A car containing five young men drove into the station. It did not stop at the pumps or at a location where a customer expecting service would go. It went to a place at the edge of the concrete driveway, away from the pumps; but the driver did not merely stop it there. He turned it around, so that the back would be at the edge of the driveway and the car would be headed out. It was parked in a way that would help make a quick getaway. None of the occupants bought anything. After going into the restroom and the office, some of them came to him and started an argument. When he would not give in, McDaniel got in the car and tried to run over him. He pulled his pistol and started shooting. His purpose was to scare them into leaving, and he had no in-

26. There was nothing to rebut the following description of Tolly given during the testimony of Robinson: "Well, from the time I met Jerry Don Tolly he seemed like an awful nice boy to me. He had never been in any trouble and it would take something awful to arouse him to do something like this. I just couldn't see him doing it without there really being something—some reason behind it. He has never shown any sign of being mean or anything like that."

27. The following statement of the law in Texas was applicable to Tolly:
"To entitle one to exercise the right of self-defense, it is not necessary that he be in fact put in danger. The danger may be apparent only, and not real. But he must not only honestly believe himself to be in immediate danger, but must also have reasonable grounds for doing so. Similarly a person need not wait until an actual attempt to harm him is made. He may defend himself when there is an act reasonably calculated to induce the belief in his mind that the execution of the threatened attack has then commenced. The reasonable apprehension of danger is a subjective matter to be determined from the viewpoint of the assailant alone, as confirmed by the surrounding facts * * *."

tention of hitting them. One of the bullets struck Greenberg before he got to the car. McDaniel got out and advanced on Tolly in a menacing way, and Tolly shot him once in self-defense.[28] McDaniel was a much larger man than Tolly. The facts justified the conclusion that Tolly fired the shots in defensive panic.

The plaintiffs brought one member of the group from Illinois and another one from Oklahoma to testify in this case. The evidence showed that McDaniel was attending school in Denton, Texas, only forty miles away from the place of the trial. He could have been brought to court under subpoena, but none was requested. His deposition was not taken. He was a logical witness for the plaintiffs and they gave no reason for his absence.

The Texas rules in regard to apparent danger and viewing the situation only from the standpoint of the accused at the time in question (footnote 28) make it of the utmost importance that a defendant in an assault case have the interested attention and advice of his counsel. An uneducated person could well think that if it developed after the shooting that there was in fact no real danger, he would be guilty, no matter how sincere and reasonable was his apprehension of danger at the time.

The fact that the jury in this case found for Tolly, in spite of his pleas of guilty, shows what could have happened if the assault cases had been tried on the facts in the state court.

■ The plaintiffs say this finding of accidental shooting must be set aside because it is against the overwhelming weight of the evidence. There is no claim that the finding is without evidence to support it. The argument is that the testimony of the disinterested witnesses overwhelmingly rebuts the evidence in favor of Tolly. There is more to determining the interest of a witness than finding out if he has any connection with the litigants. Often, the interest of

the witness appears unmistakably from his demeanor on the stand. This was that kind of a case. Only one of the "disinterested witnesses" actually saw the shooting, and nobody with any experience in the courtroom who observed her on the stand would ever say that she was the kind of person whose testimony was conclusive or overwhelming. The other two such witnesses were a policeman and his wife who heard some shots as they drove along the street in front of the filling station, and returned to see what happened. It is doubtful if it could ever be said that a policeman is a disinterested witness in a shooting case; but, again, it was apparent from the demeanor of these witnesses that they had definitely taken sides. The demeanor of all the plaintiffs' witnesses was such as to make their credibility a question for the jury.

The plaintiffs' complaint in the motion for new trial about the instructions to the jury is that the Court failed to charge the jury that Tolly's plea was conclusive on him. At the time of the trial, the Judge thought, from having sat on the panel in Tomlinson v. Lefkowitz, supra, that the plea was actually conclusive. He felt, however, that if it was, it could be taken care of on motion for judgment regardless. of how the jury found, and that to give the charge desired by the plaintiffs might prejudice the rights of Mobil and Robinson to have the assault and battery issue decided on the facts without regard to the pleas of guilty. It now turns out, after research, that the plaintiffs were not entitled to such a charge, and that there is no basis for their present complaint.

The Court has the discretion to grant a new trial in any event. The plaintiffs' case reeked with exaggerations so gross as to rule out honest mistake and with outright perjury. There is no call for the granting of a motion as a matter of discretion.

Judgment will be entered for the defendants.

28. There was no evidence to indicate that McDaniel's wound was serious.